**Simon FALIC, Jerome Falic, and Leon Falic, Plaintiffs,**

v.

**LEGG MASON WOOD WALKER, INC., a Maryland corporation, Defendant.**

**No. 03–80377–CIV–RYSKAMP.**

United States District Court, S.D. Florida, West Palm Beach.

Oct. 26, 2004.

Rudolph F. Aragon, Paul Joseph Schwiep, Burlington Weil Schwiep Kaplan & Blonsky, Miami, FL, for plaintiffs.

Angel Castillo, Jr., Morgan Lewis & Bockius, Kevin Patrick Jacobs, Homer Bonner & Delgado, Peter W. Homer, Homer & Bonner, Miami, FL, William Marvin Douberley, Douberley & Cicero, Miami Lakes, FL, for defendant.

***ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT II***

RYSKAMP, District Judge.

THIS CAUSE comes before the Court upon two motions for summary judgment filed by Defendant. First, Defendant filed a Motion for Final Summary Judgment

[DE 62] on July 19, 2004. Plaintiffs filed a Memorandum in Opposition to Defendant's Motion for Final Summary Judgment [DE 69] on August 13, 2004, and Defendant filed its Reply Memorandum in Support of Motion for Final Summary Judgment [DE 78] on August 26, 2004.

Second, Defendant then filed a Motion for Summary Judgment as to Count II [DE 74] on August 18, 2004. Plaintiffs responded [DE 79] on September 8, 2004, and Defendant filed a Reply Memorandum in Support of Motion for Partial Summary Judgment as to Count II [DE 90] on September 15, 2004.

The Court heard oral arguments from the parties on Thursday, September 23, 2004 at 11:00 a.m. The motions are now ripe for adjudication.

## I. Background

Plaintiffs are the shareholders and officers of Duty Free Acquisition Corp. (now known as DFA Holdings, Inc. and hereinafter "DFA Holdings"). *See* Second Am. Compl. [DE 41], at ¶ 10; Decl. of Simon Falic [DE 79], at ¶ 2; Decl. of Leon Falic [DE 79], at ¶ 2. On October 11, 2001, DFA Holdings acquired World Free Duty Americas, Inc. ("Duty Free") from BAA plc. *See* Second Am. Compl. [DE 41], at ¶ 11. At the time of the Duty Free acquisition, Duty Free was obligated under a bond indenture to various companies including The Prudential Insurance Company of America, U.S. Bancorp Asset Management, the California Public Employees Retirement System, General Electric Capital Assurance Company, and others (collectively, the "Bondholders"), for a principal balance of $115 million, at 7% interest per annum. *Id.* at ¶ 12.

Plaintiffs allege that shortly after the Duty Free acquisition, Defendant made various defamatory statements regarding the Plaintiffs. *Id.* at ¶¶ 13–14. First, Defendant described the "Falic Family" in an internal October 11, 2001 memorandum as "well-named" and "aggressive entrepreneurs with a history of restructurings, write-offs, bankruptcies, falling stock prices, dubious inter-family business transactions, and extremely generous salaries coming out of marginal or failing public entities." *Id.* at Exh. A. This memorandum was sent by Jeffrey Manning (a manager in Defendant's special situations group) to Joe Sullivan and Frank Jamison (managers in Defendant's fixed income group) for the purpose of discussing how Defendant might represent an ad hoc committee of Bondholders, some of whom were clients of the fixed income group. Mr. Manning based his statements on information contained in public documents and news stories. *See* Dep. of Jeffrey Manning [DE 58], at 40, 110–115.

Thereafter, Mr. Manning enlisted the assistance of Martin Mitsoff, a research analyst who regularly advised bondholders of developing market news. *See id.* at 81–83. On October 23, 2001, Mr. Manning and Mr. Mitsoff sent a memorandum to all Bondholders to warn them of the "serious and potentially total loss" of their investment and advise them of legal avenues available to them. *See* Second Am. Compl. [DE 41]. at Exh. B. In that memorandum, Defendant stated that the "Falic family" had a "checkered past" and suggested that they had been involved in a "host of restructurings, write-offs, bankruptcies, falling stock prices, controversial inter-family business transactions, and extremely generous salaries coming out of marginal or failing public entities." *Id.* Defendant offered its services to prevent or reverse "asset stripping" by DFA Holdings, and urged that BAA be notified that "the 'puke and run' strategy is a fraudulent attempt to avoid fiduciary obligations to creditors once the Company has entered the 'realm of insolvency.'" *Id.*

Plaintiffs allege that although Defendant's senior management criticized the October 23, 2001 memorandum as containing "incendiary language" and being of insufficient quality, the memorandum was re-circulated. *See* App. in Supp. of Plaintiffs' Mem. in Opp. to Defendant's Mot. for Final Summ. J. [DE 70], at Exhs. 8, 9. Additionally, on January 18, 2002, after DFA Holdings missed a coupon payment, Mr. Manning and Mr. Mitsoff sent another memorandum to the Bondholders, stating therein that they had "a number of 'good facts,' including a series of articles from the *Miami Herald* outlining the dubious business shenanigans of some of the people involved on the other side." *Id.* at Exh. 10. Finally, Mr. Mitsoff sent an internal memorandum, stating that DFA Holdings was "controlled by an asset stripper who will bleed this company dry." *Id.* at 7.

Referring to the "Falic family," some of the disparaging statements contained in the memoranda apparently concerned the business activities of Ilia Lekach, Simon Falic's brother in law. *See* Mot. for Final Summ. Judgment [DE 62], at 6; Plaintiff's Mem. in Opp. [DE 69], at 7 n. 4. Mr. Lekach did not have any involvement with DFA Holdings, but had been accused of asset stripping in connection with an entity called Luria & Sons, which filed for bankruptcy. *Id.* The asset stripping appears to have occurred after Plaintiffs divested themselves of management responsibilities in Luria & Sons. *Id. See also* Dep. of Simon Falic [DE 81], at 15, 99–100.

The Bondholders declined to retain Defendant as a financial advisor. Plaintiffs allege, however, that as a result of Defendant's memoranda, the Bondholders filed a lawsuit in the Circuit Court for Anne Arundel County, Maryland, against Plaintiffs, DFA Holdings and other parties for fraud and breach of fiduciary duty. *See* Mot. for Summ. J. as to Count II [DE 74], at Exh. A. Defendants filed a counterclaim for breach of contract, alleging that the Bondholders breached a "no action clause" of the indenture and claiming losses to Duty Free of $70 million. *Id.* at Exh. B. The lawsuit was settled between the Bondholders, DFA Holdings and the Plaintiffs in November, 2003. As part of the settlement, Duty Free agreed to pay a substantial portion of the bond obligation in cash and to provide a note for the remainder. *See* Dep. of Simon Falic [DE 81], at 58.

On May 9, 2003, Plaintiffs filed their original Complaint [DE 1] against Defendants, alleging two counts of defamation (Count I) and injurious falsehood (Count II). Plaintiffs filed a First Amended Complaint [DE 5] on May 22, 2003 and a Second Amended Complaint for Damages and Demand for Jury Trial [DE 41] on February 17, 2004.

## II. Discussion

### A. Motion for Final Summary Judgment

As an initial matter, Defendant states without conceding or briefing the choice of law issue, that its Motion for Final Summary Judgment is based on Florida law.[1] *See* Mot. for Final Summ. J. [DE 62], at 8. Accordingly, the Court does not address the choice of law issue and proceeds on the assumption that Florida law applies. Additionally, Defendant does not attack Plaintiff's *prima facie* case of defamation, and bases its summary judgment motion only on the qualified privilege defense. Thus, the Court presumes for purposes of Defen-

---

1. At the September 23, 2004 hearing, counsel for the parties stated that they agreed that Florida law should apply.

dant's motion that Plaintiffs have met their initial burden.

■ Whether a statement is protected by a qualified privilege is a question of law for the court to decide only if the circumstances surrounding the communication are undisputed or so clear under the evidence as to be unquestionable. *See, e.g., Nodar v. Galbreath*, 462 So.2d 803, 810 (Fla.1984). Generally, whether a qualified privilege exists is a mixed question of law and fact, and it is a "rare occasion" that the issue should be addressed as a matter of law. *See Shafran v. Parrish*, 787 So.2d 177, 180 (Fla. 2d DCA 2001). Florida courts recognize a qualified privilege in three types of defamation cases, namely those involving: (1) Mutuality of interest in the statement between the speaker and listener; (2) Statements made to an employer regarding the job performance of an employee, which are also statutorily protected under Fla. Stat. § 768.095; and (3) Expressions of fair comment and criticism on any public, governmental, political, social or cultural matter, which are protected under the First Amendment. *See Nodar*, 462 So.2d at 809–810. The defense raised in this case is based on a mutuality of interest privilege.

The Florida Supreme Court has explained the concept of a qualified privilege based on mutuality of interest as follows:

> One who publishes a defamatory matter concerning another is not liable for the publication if (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused.... The law of Florida embraces a broad range of the privileged occasions that have come to be recognized under the common law.... A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation.

*Nodar*, 462 So.2d at 809 (citations omitted).

■ The essential elements of the qualified privilege are: (1) good faith; (2) an interest in the subject by the speaker or a subject in which the speaker has a duty to speak; (3) a corresponding interest or duty in the listener or reader; (4) a proper occasion; and (5) publication in a proper manner. *See Thomas v. Tampa Bay Downs, Inc.*, 761 So.2d 401, 404 (Fla. 2d DCA 2000).

■ A statement is made in good faith if it is made "with a good motive, and not for the purpose of harming the subject of the defamation." *Lewis v. Evans*, 406 So.2d 489, 492 (Fla. 2d DCA 1981). Although good faith is an element of the qualified privilege, Florida courts have provided little guidance on a defendant's burden to show good faith. Apparently, when the other elements of the privilege are established, good faith is presumed. *See Thomas*, 761 So.2d at 404 ("Once it is determined that [the statement] is qualifiedly privileged, it becomes cloaked with a legal presumption of good faith"); *Demby v. English*, 667 So.2d 350, 353 (Fla. 1st DCA 1995).

The second element of the privilege requires the Defendant to show that it made the false statement pursuant to a corresponding interest or duty in the subject matter of the statement. *See, e.g., Nodar*, 462 So.2d at 809. Florida courts recognize that "[t]he nature of the duty or interest may be public, personal or private, either legal, judicial, political, moral or social. It need not be one having the force of a legal obligation; it may be one of imperfect

obligation." *Lewis,* 406 So.2d at 492. Florida courts have found a wide variety of interests to be insufficient, including: a parent's interest in his child's welfare, *Nodar,* 462 So.2d at 809; a corporation's interest in monitoring its compliance with statutory requirements, *John Hancock Mutual Life Ins. Co. v. Zalay,* 581 So.2d 178 (Fla.App. 2nd DCA 1991); political candidate's interest in defending his candidacy, *Abram v. Odham,* 89 So.2d 334, 336 (Fla.1956); a corporation's interest in responding to customer inquiries, *Shaw v. R.J. Reynolds Tobacco Co.,* 818 F.Supp. 1539 (M.D.Fla.1993); an employee's interest in serving his or her employer, *Thomas,* 761 So.2d at 405; and an organization member's duty to notify other members of information that would be detrimental to the organization's interests, *Putnal v. Inman,* 76 Fla. 553, 80 So. 316 (1918).

In the present case, the evidence is sufficient to show that Mr. Manning and Mr. Mitsoff had a valid interest in serving their employer when they sent the disparaging memoranda to the Bondholders.[2] As a manager in the special situations group, Mr. Manning was employed to engage business development strategies and solicit potential clients for the company's financial consulting services. *See* Dep. of Jeffrey Manning [DE 58], at 269–273. As a research analyst, Mr. Mitsoff was employed by Defendant to work with financial advisors to notify clients of information that might affect their investments. *See* Dep. of Martin Mitsoff [DE 70], at 349, 359. Thus, both Mr. Manning and Mr. Mitsoff acted, at least in part, to fulfill legitimate job duties within the scope of their employment. In addition, Defendant had a duty, whether of a fiduciary nature or arising from an "imperfect obligation",

to those Bondholders that were its clients to disclose information that might affect their investment. *See* Dep. of Jeffrey Manning [DE 58], at 41. Therefore, the Court finds that Defendant had valid interests in making the allegedly defamatory statements.

Next, the Court must examine whether the Bondholders had a valid interest in receiving the subject memoranda. Florida courts have found, *inter alia,* the following interests of a recipient to be sufficient for the privilege to apply: an employer's interest in knowing about the job performance of an employee, *Randolph v. Beer,* 695 So.2d 401 (Fla. 5th DCA 1997); a public entity's interest in matters of public concern, *Nodar,* 462 So.2d at 810; a merchant's interest in the creditworthiness of a customer, *Putnal,* 80 So. at 319; and a customer's interest in knowing information concerning a sales representative with whom he or she has had a longstanding relationship, *Shaw,* 818 F.Supp. at 1542–1543. In the present case, the parties do not appear to dispute that Bondholders had a valid interest in receiving information about a change in ownership and management of a corporation which was indebted to them under a bond obligation. Under the *Putnal* case, the Bondholders should enjoy a protected interest in receiving information about the creditworthiness of Duty Free after its acquisition by DFA Holdings. Therefore, the Court finds that the Bondholders had a valid interest in receiving the allegedly defamatory memoranda.

It is not sufficient for the Court to find that Defendant and the Bondholders had valid interests, as speaker and recipient. This Court must further consider whether the interests of the speaker and listener

---

2. The Court does not consider the internal memoranda actionable for purposes of defamation, as they do not constitute communications published to a third party. *See Mims v. Metro. Life Ins. Co.,* 200 F.2d 800, 801–802 (5th Cir.1952).

were corresponding, or mutual. Common interests may include shared interests in property, business and professional dealings. *See* RESTATEMENT (FIRST) OF TORTS § 596 (1938). For example, tenants in common and other co-owners of land or chattels, as well as partners, fellow officers of a corporation for profit, fellow shareholders, fellow servants, and persons associated together in professional, religious, fraternal, charitable or other non-profit associations, are conditionally privileged to communicate among themselves defamatory matter concerning their common interests. *Id.* "Common interests are usually found among members of identifiable groups in which members share similar goals or values or cooperate in a single endeavor.... The idea is to promote free exchange of relevant information among those engaged in a common enterprise or activity and to permit them to make appropriate internal communications and share consultations without fear of suit.... The privilege does not arise in the first place unless the communication relates in some degree to the common interest...'" (DAN B. DOBBS, THE LAW OF TORTS (2000), § 414, at 1160–61).

In *Teare*, the court declined to find a qualified privilege where there was no mutuality of interest between the speaker and listener. *Teare*, 98 So.2d at 83. In that case, a business agent of a local plumbers' union made slanderous remarks about the work of a non-union plumber to the plumber's employers. Specifically, the speaker told the employers that for the sake of their health they were making a mistake in hiring the non-union plumber; that his work "is known to be unsatisfactory and will not pass inspection" and that his work "has been repeatedly found to be unsatisfactory." *Id.* at 82. The court found that although the agent had a valid duty to promote the interest of the union, his primary interest was to put the non-union plumber out of a job and compel employment of union plumbers. *Id.* at 83. Moreover, there was no mutuality of duty or interest on the part of the employers. The court observed that the general subject of the communication was plumbing, and acknowledged that the work of a plumber was directly related to the health and well-being of the occupants of the building under construction. However, it found that the interest of the employers was merely to have the job completed, and they were not interested whether plumber who did job was part of the union. *Id.* Accordingly, a shared interest in the general subject of plumbing was insufficient for the privilege to apply.[3] *Id.* The court clarified that if, on the other hand, the agent had made the statement in a union meeting to other union plumbers, there would have been a mutuality of interest to justify a qualified privilege. *Id.*

---

**3.** Commonality of interest in some aspect of the subject matter of a communication is not sufficient for the privilege to apply. *See Various Markets, Inc. v. Chase Manhattan Bank, N.A.*, 908 F.Supp. 459, 467 (E.D.Mich.1995). In the *Various Markets* case, an insurance broker brought a defamation claim against his insured, after the insured's in-house counsel sent a letter threatening litigation against the broker for bad faith conduct, and copied the letter to participants in the subject insurance program. The court found that although the copied individuals may have had an interest in the insurance program, "merely having a shared interest in some aspect of the subject matter" is insufficient. The copied individuals had no real interest in the insured's pursuit of its legal remedies, and any commonality of interest in the insurance program was "not the kind of interest 'where public policy pre-supposes the necessity of frank communication' with other purportedly 'interested' parties." *Id.* (quoting *Merritt v. Detroit Mem. Hosp.*, 81 Mich.App. 279, 265 N.W.2d 124 (1978)).

Similarly, in *Drennen*, the court suggested that a qualified privilege does not exist if the speaker acts for its own unilateral interest. *Drennen*, 328 So.2d at 55. In that case, a supervisor told employees that a former employee had been discharged for taking company property. The court suggested that the employer served its own particular interest to restore morale among its workforce, and quiet rumors that were adversely affecting the company. However, the recipients were mere fellow employees of the discharged plaintiff, and not supervisors, department representatives or company officials, so there was no mutuality of interest. *Id.*

As to the Bondholders that were existing clients of Defendant, there appears to be mutuality of interest. Defendant and its clients had an existing business relationship that gave rise to at least a moral, if not legal duty, to advise those Bondholders of information that might affect the stability of their investment. As their financial advisor, Defendant shared a common interest with Bondholders to protect the Bondholders' investment. For Bondholders that were not clients, however, the analysis compels a contrary conclusion. Defendant did not share any common property, business, professional, or civic interests with these Bondholders, of the kind outlined in the RESTATEMENT (FIRST) OF TORTS. *See Scholz v. RDV Sports, Inc.*, 710 So.2d 618, 626 (Fla. 5th DCA 1998) (holding that no privilege applied to protect a professional basketball team's defamatory statements about a former assistant coach to the news media, where there was no common interest and the circumstances were not comparable to situations outlined in the RESTATEMENT (FIRST) OF TORTS). Although Defendant may have had a valid business interest in gaining the business of these Bondholders, this interest was unilateral. The Bondholders were only interested in protecting their investment, not whether Defendant should be retained as a financial advisor. A shared interest in the general subject matter of the Duty Free acquisition is not sufficient for the privilege to apply, under the reasoning of the *Teare*, *Drennen* and *Various Markets* decisions.

Defendant may be able to prove at trial that an informal business relationship existed between Defendant and those Bondholders that were not clients, to give rise to a common interest or duty. There is testimony, for example, that one of the Bondholders had purchased bonds through Defendant in the past, *see* Dep. of Brian Murray [DE 70], at 9, and that some of the Bondholders regularly received business calls from Defendant, *see id.;* Dep. of Andrew White [DE 70], at 16. However, the facts are not sufficiently developed at this stage to enable the Court to be reasonably certain that there is no genuine issue of material fact to render summary judgment.

Accordingly, the Court holds that Defendant's allegedly defamatory statements are not protected by a qualified privilege. In light of this holding, the Court need not address the issue of malice, or whether the publication was made to too wide an audience.

**B. Motion for Summary Judgment as to Count II**

In its Motion for Summary Judgment as to Count II [DE 74], Defendant argues that it is entitled to summary judgment on the injurious falsehood count because Plaintiffs have failed to allege or prove special damages that are recoverable by them individually, and Plaintiffs lack standing to sue for any of the corporations in which they own an interest. Defendant contends that Plaintiffs can only recover as

damages their attorney's fees incurred in defending the Maryland lawsuit. However, all attorney's fees were paid by Duty Free, not the Plaintiffs individually, and Count II cannot be maintained as a shareholder derivative action.

As an initial matter, the Court notes that simultaneous with this latter summary judgment motion, Defendant filed a Supplemental Motion for Leave to Amend Answer [DE 76], requesting leave to add the affirmative defense of lack of standing to recover business damages suffered by the Plaintiffs' corporations. Thus, Defendant's Motion for Summary Judgment as to Count II [DE 74] is based in part on an affirmative defense that has not been pled in its Answer to Second Amended Complaint [DE 49]. This Court can permit Defendant to assert an affirmative defense for the first time in a summary judgment motion, and the Court, finding no prejudice to Plaintiffs, thus proceeds to consider the merits of Defendant's motion. *See Miranda de Villalba v. Coutts & Co. (USA) Int'l,* 250 F.3d 1351, 1353 (11th Cir.2001).

■ The tort of injurious falsehood protects the economic interests of an injured party against pecuniary loss, in contrast to defamation, which protects the personal reputation of the injured party. *Callaway Land & Cattle Co., Inc., v. Banyon Lakes C. Corp.,* 831 So.2d 204, 209 (Fla.App. 4th DCA 2002). The gist of injurious falsehood is the "intentional interference with another's economic relations." *Salit,* 742 So.2d at 386 (quoting *Procacci v. Zacco,* 402 So.2d 425, 426 (Fla. 4th DCA 1981)). The general rule is stated in the RESTATEMENT OF TORTS (SECOND), at § 624:

> One who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property, in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendability thus caused.

Any kind of legally protected property interest which is capable of being sold or transferred, such as corporate stock, may be the subject of disparagement. *Salit,* 742 So.2d at 387. However, "it is equally possible to disparage a plaintiff's business by reflecting upon its existence or character, [or] the manner in which it is conducted." *Id.* (quoting W. PAGE KEETON *ET AL.,* PROSSER AND KEETON ON THE LAW OF TORTS, § 128 at 966 (5th ed.1984) (hereinafter "PROSSER AND KEETON")).

### I. Plaintiffs Have Failed to Plead Special Damages.

■ To survive summary judgment on their injurious falsehood claim, Plaintiffs must specifically plead special damages. *Id.* at 388. The special damage rule "requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales." *Id.* (quoting PROSSER AND KEETON, § 128 at 971). Special damages are actual, out of pocket losses which must be proven by specific evidence as to the time, cause and amount; whereas, general damages encompass the more customary harms inflicted by a defamatory falsehood, such as impairment of reputation and standing in the community. *Continental Cas. Co. v. Southwestern Bell Tel. Co.,* 860 F.2d 970, 976 (10th Cir.1988). The chief characteristic of special damages is a realized or liquidated loss. *Salit,* 742 So.2d at 387.

■ Moreover, "the pecuniary loss recoverable for the injurious falsehood is restricted to that which results *directly and immediately* from the falsehood's ef-

fect on the conduct of third persons and the expenses incurred to counteract the publication." *Bothmann v. Harrington,* 458 So.2d 1163, 1170 (Fla.App. 3d DCA 1984). The special damages pled must have been "foreseeable and normal consequences of the alleged wrongful conduct, and the conduct must be a substantial factor in bringing about the losses." *Id.* For example, in a slander of title action, attorney's fees which are incurred to remove the cloud from title are recoverable as part of the plaintiff's pecuniary loss. *Donald M. Paterson, Inc. v. Bonda,* 425 So.2d 206, 208 (Fla. 4th DCA 1983).

Plaintiffs have alleged a number of items as special damages. For example, Plaintiffs claim their damages should include over $2 million in attorney's fees incurred in defending the Maryland lawsuit. *See* Plaintiff's Mem. in Opp. to Defendant's Mot. for Summ. J. as to Count II [DE 79], at 5. However, it is undisputed that these fees were paid by Duty Free, not the Plaintiffs personally. Attorney's fees that are paid by a corporation rather than a shareholder personally cannot be considered a realized loss of the shareholder, even in the case of a sole shareholder or a closely held corporation. *See Schaffer v. Univ. Rundle Corp.,* 397 F.2d 893, 896 (5th Cir.1968); *Sterling Radio Stations, Inc. v. Weinstine,* 328 Ill.App.3d 58, 262 Ill.Dec. 230, 765 N.E.2d 56, 63 (2002). There are no circumstances in this case that would justify a departure from this well-established rule.

■ Plaintiffs have also alleged as special damages the depreciation of their stock. *See* Plaintiff's Mem. in Opp. to Defendant's Mot. for Summ. J. as to Count II [DE 79], at 6. In the *Salit* case, plaintiffs were shareholders whose stock declined after the corporation's president and law firm published falsehoods about plaintiffs and the manner in which they conducted the corporation's business. The court found that plaintiffs "claimed only that their stock declined in value" but failed to reveal any "realized loss." *Salit,* 742 So.2d at 388. Accordingly, the court gave plaintiffs leave upon remand to replead the injurious falsehood count and show special damages, "a loss actually sustained by them which might not be common to other shareholders." *Id.* In other words, "a shareholder alleging injurious falsehood must, instead of pleading diminution in stock value, plead 'realized loss,' *i.e., the shareholder sold the stock at a loss.*" *Leavitt v. Cole,* 291 F.Supp.2d 1338, 1343 n. 4 (M.D.Fla.2003) (emphasis added). In this case, Plaintiffs have not alleged that they sold their shares in Duty Free at a loss. Thus, Plaintiffs' mere allegation that the value of their stock in Duty Free (via their interest in DFA Holdings) depreciated does not constitute a *realized* loss required for special damages.

■ Finally, Plaintiffs allege that as a result of the alleged defamation by Defendant, vendors, creditors and other third parties declined to do business with Duty Free. For example, Plaintiffs allege that LaSalle Bank of Chicago refused to extend letters of credit to Duty Free. *See* Dep. Of Simon Falic [DE 81], at 59. Plaintiffs further claim that Duty Free also lost multi-million dollar contracts to operate duty free stores, including at Los Tomates and the Hartsfield–Jackson Atlanta International Airport. *Id.* at 59–60; Decl. of Simon Falic [DE 79]; Decl. of Leon Falic [DE 79]. In addition, Plaintiffs allege that suppliers imposed "cash on delivery" terms or demanded substantial guarantees from Duty Free. *Id.* The foregoing damages described by Plaintiffs could be recoverable by Duty Free, as a corporation can properly allege special damages for injurious falsehood by identifying the loss of specific customers or transactions lost

as a result of the disparagement. *See, e.g., Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.,* 12 F.Supp.2d 1035, 1043–1044 (C.D.Cal.1998). However, such damages are not realized losses suffered by Plaintiffs individually, and therefore cannot be considered special damages recoverable by Plaintiffs.

## II. Plaintiffs Cannot Maintain this Action as a Direct Action.

■ Lastly, the Court considers whether this suit can be maintained as an individual action. It is well-established that in general, the proper party to bring a claim on behalf of a corporation is the corporation itself. In other words, "where the business or property allegedly interfered with... is that being done and carried on by a corporation, it is that corporation alone, and not its stockholders (few or many), officers, directors, creditors or licensors, who has a right of recovery, even though in an economic sense real harm may well be sustained as the impact of such wrongful acts bring about reduced earnings, lower salaries, bonuses, injury to general business reputation, or diminution in the value of ownership." *Martens v. Barrett,* 245 F.2d 844, 846 (5th Cir.1957). This general rule is applicable even where the individual is the sole shareholder of the corporation. *See Schaffer,* 397 F.2d at 896. Accordingly, the proper party to bring the injurious falsehood claim in this case is the corporate entity, Duty Free. A corporation can bring a defamation claim in its own name for imputation defamatory to the corporation's stockholders, officers or employees, where that corporation has suffered special damages flowing from the defamation. *See, e.g., Novick v. Hearst Corp.,* 278 F.Supp. 277, 279 (D.C.Md.1968).

As a limited exception, however, a shareholder can bring a derivative suit on behalf of a corporation. *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 531–532, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984). A derivative action is one "in which a stockholder seeks to enforce a corporate right of to prevent or remedy a wrong to the corporation, where the corporation, because it is controlled by the wrongdoers or for other reasons, fails and refuses to take appropriate action for its own protection." *Salit,* 388. The present case does not involve circumstances that would allow for a derivative action. There is no allegation that Duty Free is unable to protect itself because of the conduct of a majority shareholder; rather, the Plaintiffs are the sole shareholders of Duty Free and are in apparent agreement in recovering damages for alleged defamation by a third party that has affected their corporation adversely. The Court cannot discern any reason to justify a departure from the general rule that the corporation bring a claim for injuries suffered by the corporation.

In contrast to derivative actions, a direct or individual action, is "a suit by a stockholder to enforce a right existing in the stockholder." *Id.* A direct action is thus, a limited exception to the rule regarding derivative suits, and allows a shareholder to sue on his or her own behalf if he or she (1) is not similarly situated to other shareholders; (2) suffers a distinct injury (i.e., special damages) from the other shareholders; and (3) does not have the same opportunity to be made whole by a corporate recovery. *Kloha,* 246 F.Supp.2d at 1243.

The *Salit* court concluded that the injurious falsehood action was properly brought as a direct claim because the plaintiffs sought compensation for damage to their personal property interests as shareholders, and did not seek to obtain a benefit that would inure to the corporation. *Salit,* 742 So.2d at 389. That case involved

alleged defamation by one shareholder of the corporation concerning another, that is, an intra-corporation dispute. The court explained that "[t]he injurious falsehood claim in this case does not derive from a duty or obligation owed to the corporation..." *Id.* In other words, the direct claim was proper because the injured shareholder suffered property damages unique to himself and distinct from the other shareholders, and he could not be made whole by a corporate recovery. *See Kloha*, 246 F.Supp.2d at 1243.

Although *Salit* makes clear that an injurious falsehood claim *may* be maintainable as a direct action under the facts of that case, this Court declines to interpret that decision as allowing *all* injurious falsehood claims, by mere nature of the action, to be brought as direct actions. Plaintiffs are not relieved from the requirement of showing that they suffered personal property damages unique to themselves and distinct from other shareholders (or from the corporation as a whole), nor have they satisfied this requirement. In this case, the defamatory memoranda essentially treated the "Falic family" and Duty Free as one entity, and affected the willingness of third parties to do business with Duty Free. It can be said, then, that this injurious falsehood claim derives from a duty or obligation owed to the corporate entity. All damages claimed ($2 million in attorney's fees, diminished stock values, lost contracts) were those of the corporation. As the only shareholders of DFA Holdings, which owns Duty Free, Plaintiffs can be made whole by any recovery by Duty Free. Thus, *Salit* is distinguishable from the present case, and does not allow Plaintiffs to maintain their claim as a direct action.

### III. Conclusion

THIS COURT, having considered the motions and the arguments before this Court at the September 23, 2004 hearing, and being otherwise fully advised in the premises, does hereby

ORDER AND ADJUDGE that:

(1) Defendant's Motion for Final Summary Judgment [DE 62] is DENIED.

(2) Defendant's Motion for Summary Judgment as to Count II [DE 74] is GRANTED.